UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

IVAN LOZANO,

               Petitioner,

   v.

WARREN L. MONTGOMERY,
Warden,

               Respondent.

Case No. 2:19-cv-02267-MAA

**MEMORANDUM DECISION AND ORDER DENYING FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

## I.    INTRODUCTION

On March 19, 2019, Petitioner, an inmate housed in Calipatria State Prison acting *pro se*, filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254 ("Petition").  (Pet., ECF No. 1.)  On October 14, 2019, Petitioner filed a First Amended Petition ("FAP").  (FAP, ECF No. 16.)  The FAP challenges Petitioner's 2014 conviction in the Los Angeles County Superior Court.  (*Id.* at 2.)[1]  On March 26, 2020, Respondent filed an Answer.

---

[1] Pinpoint citations of briefs, exhibits, and Lodged Documents ("LD") in this Order refer to the page numbers appearing in the ECF-generated headers.  Pinpoint

(Answer, ECF No. 28.)  Petitioner filed a Traverse on July 22, 2020.  (Traverse, ECF No. 33.)

Pursuant to 28 U.S.C. § 636(c), the parties consented to the jurisdiction of a United States Magistrate Judge.  For the reasons stated below, the Court denies the FAP and dismisses this action with prejudice.

## II. PROCEDURAL SUMMARY

On December 4, 2013, a Los Angeles County Superior Court jury convicted Petitioner of two counts of conspiracy to commit murder (Cal. Penal Code §§ 182(a)(1), 187(a)) and found true the allegations that the offenses were committed to benefit a criminal street gang (Cal. Penal Code §§ 182(a)(1), 186.22(b)(1)(C), 187(a)).  (6 CT 1099, 1102.)  The jury also convicted Petitioner of carrying a loaded firearm (Cal. Penal Code § 1203(a)(1)) and found true the allegation that the offense was committed while Petitioner was an active participant in a criminal street gang (Cal. Penal Code § 12031(a)(2)(C)).  (6 CT 1100.)  The jury further convicted Petitioner of three counts of active participation in a criminal street gang (Cal. Penal Code § 186.22(a)).  (6 CT 1101, 1103–04.)  The trial court sentenced Petitioner to state prison for a term of fifty years to life.[2]  (6 CT 1248–51.)

///

Petitioner appealed his judgment of conviction to the California Court of Appeal.  (6 CT 1261–62; LD 3.)  The California Court of Appeal issued a reasoned decision reversing the conviction on Count 16 (one of the counts of active

---

citations of the Clerk's Transcript ("CT," ECF Nos. 29-1 to 29-6) and Reporter's Transcript ("RT," ECF Nos. 29-7 to 29-23) refer to the transcripts' own volume- and page-numbering schemes.

[2] After conviction, at the prosecutor's request, the trial court dismissed one of the counts of active participation in a criminal street gang under Cal. Penal Code § 1385, and Petitioner was not sentenced on that count.  (6 CT 1259–60.)

1  participation in a criminal street gang), but otherwise denying Petitioner's appeal

2  and affirming the judgment.  *People v. Roman*, No. B267330, 2018 Cal. App.

3  Unpub. LEXIS 3235 (Cal. Ct. App. May 9, 2018).  (LD 6.)  The California

4  Supreme Court summarily denied Petitioner's petition for review.  (LD 7; LD 8;

5  LD 10.)

6       On March 19, 2019, Petitioner filed the Petition in this Court.  (ECF No. 1.)

7  On the same date, Petitioner also filed a Motion for Stay and Abeyance pursuant to

8  *Rhines v. Weber*, 544 U.S. 269 (2005) ("Motion").  (Mot., ECF Nos. 3–4.)  He then

9  filed a habeas corpus petition in the California Supreme Court raising Ground

10  Three, which was denied without comment or citation of authority.  (LD 9; LD 10.)

11  The Court denied the Motion as moot and granted Petitioner leave to amend the

12  Petition.  (ECF No. 13.)  On October 14, 2019, Petitioner filed the instant FAP.

13  (ECF No. 16.)

14

15  **III.   FACTUAL SUMMARY**

16       Pursuant to 28 U.S.C. § 2254(e)(1), a factual summary from a state appellate

17  court's opinion is entitled to a presumption of correctness that may be rebutted only

18  by clear and convincing evidence that the facts were otherwise.  *See Hedlund v.*

19  *Ryan*, 854 F.3d 557, 563 (9th Cir. 2017).  Petitioner does not challenge the

20  following summary of the evidence presented at trial as described in the California

21  Court of Appeal's decision of Petitioner's direct appeal:[3]

22         In 2006 and 2007, the Los Angeles Sheriff's Department

23        conducted a wiretap investigation involving the Compton Varrio Locos

24        Trece gang, commonly called "Locos Trece."  The investigation

25        resulted in the indictment of multiple members and associates of the

26

27  [3] Petitioner and his co-defendants, Mr. Roman and Mr. Rodriguez, separately
challenged their convictions, but the California Court of Appeal addressed their

28  appeals in one decision.  (LD 6.)

gang.  Roman, Rodriguez, and Lozano were tried together.[1]  With one exception, the charges pertained to five separate events between December 2006 and May 2007.

> [1]To distinguish the three individuals tried in this trial from the others with whom they were indicted, we use the terms "defendants" and "co-defendants" to refer to Roman, Rodriguez, and Lozano, and we refer to the other individuals charged in the indictment as "collaborators."

. . . .

[T]he "Lucien Street Incident," occurred on December 17, 2006. In conjunction with this event, both Roman and [Petitioner] were convicted of conspiracy to commit murder (count 5), with a gang enhancement allegation under section 186.22, subd. (b)(1)(C) found true; and active participation in a criminal street gang (§ 186.22, subd. (a) ) (count 7).  [Petitioner] was also convicted of carrying a loaded firearm as an active participant in a criminal street gang (fmr. § 12031, subds. (a)(1), (a)(2)(C)) (count 6).

. . . .

Rodriguez and [Petitioner] were charged with four offenses in conjunction with the February 3, 2007 "Baby Shower Incident," so named because the alleged victims were attendees at a baby shower: conspiracy to commit murder (count 14), active participation in a criminal street gang (count 15), and two counts of attempted murder (counts 21 and 22).  Both men were convicted on counts 14 and 15, with a true finding on the gang enhancement allegation attached to count 14.  The two attempted murder counts against [Petitioner] were dismissed after a mistrial; Rodriguez was convicted on each of those counts but they were subsequently dismissed on the prosecutor's motion after two witnesses recanted.

4

1   . . . .

2      Finally, all three defendants were charged with and convicted of

3   actively participating in a criminal street gang (§ 186.22, subd. (a))

4   between December 2006 and May 2007 (count 16).

5   (LD 6 at 2–5.)

6

7   **IV.   PETITIONER'S CONTENTIONS**

8      In the FAP, Petitioner asserts three grounds for federal habeas relief:[4]

9    1. The trial court violated Petitioner's due process rights under the Sixth

10     and Fourteenth Amendments by denying his motion for a new trial

11     based on perjured testimony.  (*See* FAP 5, 39–43.)

12   2. The trial court denied Petitioner his right to confront witnesses by

13     permitting a gang expert to present hearsay to the jury.  (*See id.* at 5,

14     43–48.)

15   3. Appellate counsel provided ineffective assistance by failing to exhaust

16     the claim that the trial court erred when it failed to sua sponte give an

17     unanimity instruction as set forth in CALCRIM No. 3500.[5]  (*See id.* at

18     6, 15.)

19  ///

20  ///

21  ///

22

23  [4] It appears that Petitioner raises three claims in the FAP, as he alleged "same as

24  ground three" for Grounds Four and Five.  (*See* FAP 5.)

25  [5] For Ground Three, Petitioner references the "attached denial petition," and states

26  "prejudicial error by trial ct failed to sua sponte to give un[animity] instruction pg
(5 of 6) when a judge knows that he lacks jurisdiction."  (*See id.* at 6.)  The Court

27  interprets Ground Three as the ineffective assistance of appellate counsel claim that

28  was denied in the habeas petition he filed in the California Supreme Court, which is
attached to the FAP.  (*See id.* at 6, 15.)

## V.    STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 2254(d) ("Section 2254(d)"), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Pursuant to AEDPA, the "clearly established Federal law" that controls federal habeas review of state-court decisions consists of the holdings, as opposed to the dicta, of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

Although a state-court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. *See id.* at 391, 412–13. A state-court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts binding governing Supreme Court law or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *see also Woods v. Donald*, 575 U.S. 312, 317 (2015) ("[I]f the circumstances of a case are only 'similar to' our precedents, then the state court's decision is not 'contrary to' the holdings in those cases."). When a state-court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." *See Williams*, 529 U.S. at 406.

6

State-court decisions that are not "contrary to" Supreme Court law may be set aside on federal habeas review "only if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or based on 'an *unreasonable* determination of the facts.'" *Packer*, 537 U.S. at 11 (quoting Section 2254(d)). A state-court decision that correctly identifies the governing legal rule may be rejected if it unreasonably applies the rule to the facts of a particular case. *See Williams*, 529 U.S. at 406 (providing, as an example, that a decision may state the *Strickland* standard correctly but apply it unreasonably). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." *Woodford v. Viscotti*, 537 U.S. 19, 27 (2002) (per curiam). An objectively unreasonable application is "not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)). Instead, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The same standard of objective unreasonableness applies where the petitioner is challenging the state court's factual findings pursuant to Section 2254(d)(2). *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding . . . .").

With respect to Grounds One and Two, the California Court of Appeal rejected Petitioner's claims on the merits in a reasoned decision denying, in part, his direct appeal. (LD 6.) The California Supreme Court summarily denied the petition for review. (LD 8.) For the purpose of AEDPA review, the California Court of Appeal's denial of Petitioner's claims is the relevant state-court

adjudication. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (where state supreme court decision is unexplained, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning"); *Castellanos v. Small*, 766 F.3d 1137, 1145 (9th Cir. 2014).

With respect to Ground Three, the California Supreme Court summarily denied Petitioner's state habeas petition containing this claim. (LD 9; LD 10.) Because no state court has explicitly addressed the merits of Ground Three, the Court must conduct an "independent review of the record" to determine whether the California Supreme Court's ultimate decision to deny this claim was contrary to, or an unreasonable application of, clearly established federal law. *See Murray v. Schriro*, 745 F.3d 984, 996–97 (9th Cir. 2014); *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013).

## VI.   DISCUSSION

The Court considers each of the three grounds for relief and concludes that Petitioner is not entitled to federal habeas relief. Consequently, the FAP is denied.

### A.   Ground One

In Ground One, Petitioner alleges that the trial court violated Petitioner's due process rights under the Sixth and Fourteenth Amendments by denying his motion for a new trial based on perjured testimony. (FAP 5.) Respondent contends that Ground One is not cognizable on federal habeas review, and in any event, the California Court of Appeal reasonably rejected this claim. (Answer 12.) For the following reasons, Ground One must be denied.

///

///

///

1

     1.    <u>Background</u>

2          Alfredo Mejia Vargas and Alejandro Hernandez testified at trial regarding

3 the "Baby Shower Incident" that occurred on February 3, 2007.  Vargas testified

4 that he had been standing in the front yard of his residence when a red car with two

5 Hispanic men stopped in the street.  (9 RT 4222–25.)  The man in the front

6 passenger seat of the vehicle discharged a weapon at the people standing in front of

7 Vargas's residence, and Vargas picked up a rifle and returned fire as the vehicle

8 fled.  (*Id.* at 4225–28.)  Following trial, but prior to sentencing, Vargas recanted,

9 and at a subsequent trial, testified that no one in the red car pointed or discharged a

10 weapon or said anything, and he had not fired at the red car.  (FAP 38.)  Vargas

11 asserted that one of his neighbors shot at the car and told Vargas to hide the weapon

12 for him.  (*Id.* at 39.)

13         Hernandez testified that about an hour prior to the shooting, he saw a red car

14 in the area, following the car he was in.  (8 RT 3943–45, 3972.)  He was inside the

15 house when he heard gunshots, and did not see anyone shoot from a vehicle.  (*Id.* at

16 3948, 3981–82.)  After the shooting, he went outside and saw Vargas holding a

17 rifle.  (*Id.* at 3948–50.)  Following trial, but prior to sentencing, Hernandez

18 recanted.  (LD 6 at 34; FAP 38.)  Hernandez admitted that he lied about seeing

19 anyone with a firearm and about seeing any vehicles that might have been involved

20 in the shooting.  (FAP 38.)  He stated that he had not seen cars involved in a

21 shooting, firearms, or anyone shooting.  (*Id.*)

22         Due to the recantations, the prosecutor moved to dismiss two counts of

23 willful, deliberate, and premeditated murder in the Baby Shower Incident against

24 Rodriguez, one of Petitioner's co-defendants.  (17 RT 9901–03, 11403; 6 CT 1151,

25 1215.)  The trial court voided and dismissed Rodriguez's convictions on those

26 counts due to the recantations.  (17 RT 9902.)  Petitioner also was charged with

27 those counts, but the jury deadlocked and was unable to reach a verdict against him,

28 so no dismissal was taken as to him.  (6 CT 1121.)

1    Thereafter, Petitioner filed a new trial motion, alleging that the testimony of
2    Vargas and Hernandez had tainted the remaining verdicts against him.  (*Id.* at
3    13201.)  The prosecutor filed an opposition.  (*Id.* at 13202; 6 CT 1210.)  The trial
4    court denied Petitioner's motion:

5            [N]ormally if a witness was to come in and testify falsely during
6            a criminal proceeding, a trial, you would be extremely concerned
7            about any conviction that was related to that testimony.

8            However, this case is completely unusual and out of the ordinary
9            because the entire crime was plotted and partially carried out on a
10           wiretap, which we heard, and the conspiracy has absolutely nothing to
11           do with the other counts on which [Petitioner] was convicted of.

12           As I say, this is an unusual situation, but you can see the entire
13           crime, the fact that an individual testified about who fired at whom and
14           later admitted that he was not testifying truthfully is irrelevant because
15           of all the other evidence where you can't – you can have no doubt that
16           the crime took place and the jury had ample evidence to convict on.
17           So the motion for new trial is denied.

18   (17 RT 13202.)

19   The California Court of Appeal concluded that the trial court did not abuse
20   its discretion in denying the motion for new trial.  (LD 6.)  The appellate court
21   summarized the evidence presented at trial, notwithstanding the recanted testimony:

22           The Baby Shower Incident began on February 2, 2007, with a
23           flurry of intercepted telephone calls.  Shortly after 5:00 p.m. Roman
24           called Carlos Montelongo and told him that someone in a white Honda
25           had just shot at him and Pasqual Campos.  Pasqual called his brother
26           Saul and told him to stay indoors because of the shooting.  Pasqual
27           said their mother had talked about calling the police but told her he
28           would handle this himself.

1
2
3
4
5
6
7
8

The collaborators then began attempting to locate guns and ammunition.  At 5:45 p.m. Felix Silva told Rene Rivera about the shots fired at Roman and Pasqual, and they discussed getting a gun, noting that Montelongo had one.  Rene Rivera then told his brother Anthony about the shooting and the attempts to get a weapon into the neighborhood.  Rene said that one gun was being held by "Kiki" for Montelongo.  The Riveras speculated that Roman and Pasqual had been shot at by one of Locos Trece's two rival gangs.

9
10
11
12
13
14
15
16
17

In a 7:20 p.m. call, [Petitioner] and another person discussed the shooting and how to get a gun into the neighborhood.  "Kiki" was mentioned as the person holding a mini-14 assault rifle for Montelongo.  Just before 8 p.m., Pasqual described the shooting to [Petitioner].  He described the shooter as looking familiar, probably someone from one of the rival gangs, and reported that he was standing guard in the neighborhood looking for the white Honda. [Petitioner] told Pasqual that he was trying to obtain a weapon so Pasqual would not have to borrow one.

18
19
20
21
22
23
24
25
26

A few minutes later [Petitioner] told Rodriguez that he had all the "banana ones," referring to a large capacity magazine shaped like a banana and called a banana clip.  [Petitioner] told Rodriguez that Montelongo had the mini-14 assault rifle and that the banana clips were at "Big Mono's house."  Rodriguez asked [Petitioner] if the clips were loaded.  [Petitioner] confirmed that they were loaded, and told Rodriguez to go get them.  Rodriguez agreed, and [Petitioner] exhorted him, "[T]ag them mother fuckers, fool.  Don't let them niggas go on y['all's] block and bust on y['a]ll."  Rodriguez again agreed.

27
28

At 8:13 p.m., Rodriguez asked [Petitioner] to call Big Mono so he (Rodriguez) and Montelongo could pick up the banana clips.

11

[Petitioner] then instructed Roman to call Big Mono and tell him to take out the clips he had for the mini assault rifle because "[t]he homies are going to pick it up right now."  Roman told Big Mono that [Petitioner] wanted the clips for the mini assault rifle, then reported back to [Petitioner] at 8:22 p.m. that Big Mono agreed to have the clips ready.  [Petitioner] directed Roman to have Rodriguez pick them up.

At 8:24 p.m., [Petitioner] told Jesus Garcia that the "little homies" "are going to go over and handle that shit right now."  About half an hour later, Saul was recorded telling Montelongo, "Let[']s go cause some damage, fool."  To "cause damage" means to perform a shooting or to cause some other kind of mischief.  Montelongo said he also wanted to cause some damage and that he wanted to "serve those fools," meaning to shoot at their rivals; he had ammunition and was looking for a stolen car.  Montelongo said he would shoot with the mini assault rifle while Saul used the nine millimeter gun.

At 11:23 p.m., [Petitioner] called Rodriguez to check up on him and to find out what was going on in the neighborhood.  Rodriguez told [Petitioner] that Montelongo had the mini assault rifle and the clips.

The next evening, February 3, 2007, Saul told Rodriguez that Montelongo wanted to get a stolen car and that they would pick up Rodriguez.  Rodriguez instructed Saul to call when they had reached a certain location.

In a 7:03 p.m. conversation, Rodriguez complained to Montelongo that they were having difficulty operating the vehicle.  Montelongo told Rodriguez to drive because they could not risk being pulled over by the police.  In the next conversation, at 7:06 p.m., it appeared that Rodriguez was now driving the car.  Montelongo

directed them to wait for him on Cherry Street, where he lived, because he had a weapon.  A few minutes later, Montelongo said he was going to go to Bliss Street to make sure the intended targets were there.  Montelongo told Saul, "[W]e're going to roll right now."  After further coordination about parking Montelongo told Rodriguez to come out "so we can plan this shit out right quick."

At this point, the police, who were listening to these conversations by means of the wiretap, sent numerous police cars to the area.  The men sought to hide the assault weapon.  Shortly after 8:00 p.m., Rodriguez asked Roman about dropping off the mini assault rifle right away, but Roman refused.  Rodriguez immediately called another person, "Shanky," to see if he could take the mini assault rifle from them "real quick."  Shanky asked who was with Rodriguez, who answered that he was with Montelongo and one of the Campos twins.

At 8:20 p.m., Pasqual asked Saul if he had the AK-47 assault rifle with him, and told Saul that if Saul got caught he should make sure that Rodriguez took the blame, as Rodriguez was not wanted in the Locos Trece neighborhood anyway.  At 8:39 p.m. Montelongo told Saul that if he saw "those niggers" that he should shoot them, but that he should make sure that there were no bystanders so that no one would see his face.

Laura Marquez, Montelongo's girlfriend, testified under a grant of immunity that she and Montelongo were in his van at approximately 8:45 p.m. on February 3, 2007.  Montelongo was driving.   They stopped to pick up Saul and Rodriguez, who were carrying a long gun.  Montelongo drove past 2227 Bliss Street, and Saul said he wanted to shoot someone at that house.  Marquez told Montelongo she wanted to

///

go home, but he said he wanted her with him because "it was going to be obvious" if only men were in the van.

Saul and Rodriguez left the van and got in a red car.  Rodriguez drove, and Saul sat in the front passenger seat.  Montelongo stopped his van at the corner of Bliss Street and pointed out 2227 Bliss Street as the target.  Saul and Rodriguez drove the red car down Bliss Street.

Marquez's accounts of the shooting varied.  On the night of the shooting Marquez led the police to 2227 Bliss Street.  She said that she saw Saul shoot at the house once and that residents on the street fired back several times.  She told the police that she heard more than eight gunshots.  Marquez said that she knew the later shots were different from Saul's shot because they sounded different.  At trial, however, Marquez testified that she had not seen the shooting and that she lied to the police when she said Saul fired the gun first.  Marquez testified that she actually heard two or three gunshots, and that afterwards one of the men, either Saul or Rodriguez, said he had put a gun out the window of the car.  Marquez testified that after the shooting Saul and Rodriguez returned to the van and sat in the back.  Saul had been shot in the buttocks.  They were going to take Saul to the hospital when the police stopped them.

Fujino was one of the police officers who responded to the area on the night of February 3, 2007, because of the intercepted calls indicating that a drive-by shooting was possibly about to occur there.  At approximately 8:45 p.m., Fujino saw a gray van driving on Bliss Street with its headlights off.  The van double parked on the street, and then Fujino heard seven or eight gunshots fired from the vicinity of the van.  Five to 10 seconds later, the van started to move, its headlights went on, and the vehicle made a turn.  Fujino followed the van and

called for backup.  Fujino was present as other officers stopped the van and removed its occupants.  He later saw Montelongo, Marquez, and Rodriguez in custody and Saul being treated for a gunshot wound.

Deputy Sheriff Russell Helbing heard the gunshots and stopped the van.  Montelongo was the driver, Marquez the front passenger, and Saul and Rodriguez the rear passengers.  Saul was bleeding from the buttocks and said he had been shot.  Helbing found a mini-14 assault rifle in the van.

A red Honda Civic was found abandoned in the area of the shooting.  DNA from the blood found on the car's passenger seat matched Saul's DNA, as did DNA extracted from blood from the van's rear seat.  Saul also had gunshot residue on his hands.

Fujino interviewed Jesse Mejia the evening of the shooting. Mejia, an attendee at the baby shower, had seen a gray van pass by the house four or five times and a red compact car pass by at least once before the shooting.  Mejia recognized the van as related to Locos Trece.  At the time of the shooting, Mejia saw at least two individuals in the red car, a driver and a front passenger, and he saw seven to eight flashes of what he believed was gunfire.  Mejia heard someone in the car call out, "Locos."  Mejia said his father, Alfredo Mejia Vargas, returned fire with a rifle and the red car drove away.

Mejia was a reluctant witness at trial.  He testified that he had seen a red car driving slowly near the house during the baby shower; its lights were off although it was somewhat dark outside.  He was in the driveway at the time of the shooting and heard gunshots.  He testified that he could not see the occupant(s) of the car and that he did not hear anyone call out.  He no longer remembered if his father had a gun and did not see his father holding a rifle after the shooting.  Mejia

testified that he had spoken with the police the night of the shooting and that he had told them the truth.  He denied telling the police about a gray van passing by the house before the shooting or stating that the van belonged to Locos Trece members, but he testified that the police showed him a gray van and that he told them he recognized it as the van he had seen earlier in the day.  He denied telling the police that the red car was present at the shooting, that he saw a driver and a passenger in that car, or that there were gunfire flashes after the red car drove past the house with its lights off.  He also denied telling the police that his father had returned fire.

Also at trial Mejia admitted that he had testified before the grand jury, but he initially denied making the responses shown in the transcript of the grand jury proceedings.  Upon questioning by the court, Mejia then admitted that he had in fact given that testimony before the grand jury.  This testimony included Mejia's statements that he had seen a gray van and a red car drive by; that when the red car drove slowly by the passenger fired at them from the vehicle; that his father then shot back at the car with a rifle; and that he had not heard anyone in the red car say anything.  Mejia claimed that his responses were different at trial because he had now forgotten what happened. Mejia denied knowing what Locos Trece was at trial but acknowledged that he had testified before the grand jury that the Bliss Street house was in the territory of the Locos Trece and Tortilla Flats gangs, that the two gangs did not get along, and that Locos Trece members never came to his home but Tortilla Flats members did.

///

///

///

16

Deputies recovered a rifle from the backyard of Vargas's home after the incident, and the parties stipulated that shell casings found in the street on Bliss Street matched that weapon.

(*Id.* at 26–33) (footnotes omitted).

In light of the remaining evidence against Petitioner, the California Court of Appeal found that the recanted testimony was not material to Petitioner's convictions:

The use of false evidence to convict a criminal defendant offends due process where such evidence is substantially material or probative; that is, if there is a reasonable probability that, had it not been introduced, the result would have been different. . . .

The trial court did not abuse its discretion in denying the motion for new trial because the evidence was not material to the remaining convictions.  While the attempted murder charges associated with the Baby Shower Incident were properly dismissed as a result of the two recantations, nothing about the recantations tends to undermine Rodriguez and [Petitioner's] convictions for active participation in a criminal street gang, conspiracy to commit murder, or any of the other surviving charges.  The conspiracy was complete, and [Petitioner's] participation in the criminal street gang established, before Rodriguez drove down Bliss Street.  [Petitioner] and Rodriguez were recorded, along with fellow Locos Trece members and associates, planning a drive-by shooting in retaliation for shots fired at Roman and Pasqual. The calls demonstrated the conspirators' intent to secure a gun, ammunition, and a stolen vehicle; their attempts to locate their intended victims; their plan to commit a retaliatory shooting; the intended street for the shooting; and their plan to escape the scene. Moreover, the conspiracy was established by Marquez's testimony that

1  she heard Rodriguez and others discussing their plans to commit the

2  shooting and that they drove past the Bliss Street house.  Non-recanted

3  evidence established that Rodriguez and Saul drove down Bliss Street

4  and put the weapon out the car window.  The active participation in a

5  criminal street gang and conspiracy counts did not turn on whether

6  Rodriguez and Saul fired a weapon when they drove down Bliss

7  Street, and there is no reasonable possibility that the jury would have

8  returned a different verdict on the active participation in a criminal

9  street gang and conspiracy counts, or on any of the surviving charges

10  in the absence of the now-recanted testimony.  Rodriguez and

11  [Petitioner] have not established error.

12  (*Id.* at 36–37) (citations and footnote omitted).

13

14          2.    <u>Legal Standard</u>

15       Errors of state law generally do not provide a basis for federal habeas relief.

16  *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  The Supreme Court has not held

17  that criminal defendants have a constitutional right to a new trial absent a finding

18  that a federal constitutional error occurred during the trial.  *See Herrera v. Collins*,

19  506 U.S. 390, 408 (1993) ("The Constitution itself, of course, makes no mention of

20  new trials.")  In California, "a motion for a new trial in a criminal case is a statutory

21  right and may be made only on grounds enumerated in Section 1181 of the Penal

22  Code, exclusive of all others."  *People v. Dillard*, 168 Cal. App. 2d 158, 167

23  (1959).

24       A petitioner cannot "transform a state-law issue into a federal one merely by

25  asserting a violation of due process."  *Langford v. Day*, 110 F.3d 1380, 1389 (9th

26  Cir. 1996); *see also Little v. Crawford*, 449 F.3d 1075, 1083 n.6 (9th Cir. 2006)

27  (observing that federal courts "cannot treat a mere error of state law, if one

28  occurred, as a denial of due process; otherwise, every erroneous decision by a state

court on state law would come here as a federal constitutional question." (citation omitted)).

Only if the state law error rendered a proceeding fundamentally unfair might that error violate a petitioner's federal due process rights. *See Estelle*, 502 U.S. at 67; *see also Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 897 (9th Cir. 1996) ("While a petitioner for federal habeas relief may not challenge the application of state [court] rules, he is entitled to relief if the [state court's] decision created an absence of fundamental fairness that 'fatally infected the trial.'").

### 3.   Discussion

To the extent that Petitioner asserts that the trial court misapplied state law in its denial of the new trial motion, such a claim is not cognizable on federal habeas review. *See Estelle*, 502 U.S. at 67.

To the extent that Petitioner asserts that the denial of the new trial motion violated his due process rights, his claim fails. Petitioner attached his opening brief on direct appeal as Exhibit A to the FAP, wherein he argues that the perjured evidence about the red car driving by culminating in shots being fired was the "final piece in the puzzle educating the jury," and that without the eyewitness testimony, the evidence against Petitioner regarding the conspiracy and active participation in a criminal street gang counts "is much less compelling." (FAP 41–43.)

Petitioner fails to show that the trial court's denial of his new trial motion was so prejudicial that it rendered his state court proceedings fundamentally unfair. Even without the recanted testimony, there was ample evidence supporting Petitioner's convictions of the conspiracy and active participation in a criminal street gang counts. As the California Court of Appeal noted, the jury heard evidence that the conspiracy was complete and that Petitioner actively participated in the criminal street gang before Rodriguez drove down Bliss street and the perjured evidence about the red car driving by came into play. Wiretaps established

that shortly before the Baby Shower Incident, Petitioner and his co-defendants made a plan, coordinated getting a gun into the neighborhood, directed people to specific locations, and people went to those locations for a retaliatory gang shooting. (12 RT 5440–56, 5458–86.) In a flurry of calls, Petitioner was recorded actively participating in the planning, coordination, and execution of the plan. (*Id.* at 5450–86.) Marquez's testimony also supported the existence of the conspiracy, as Rodriguez, Saul, and Montelongo discussed their plan to shoot at the residence in her presence, and drove past the residence prior to the shooting with her in the vehicle. (9 RT 4310; 10 RT 4510–22; 11 RT 4863.)

Despite Petitioner's argument that because of the recantations there was no evidence that the baby shower shooting occurred (FAP 41), the evidence showed otherwise. The evidence established that Rodriguez and Saul discharged the rifle in their possession during the course of the incident. Marquez told deputies that Saul had fired his weapon at the residence. (10 RT 4544–45, 4553–54; 11 RT 4864–65.) Jessie Medina also established that Rodriguez and Saul discharged their weapon during the shooting. (8 RT 4019–21, 4025.) Further, swabs taken from Saul's hands moments after the shooting occurred tested positive for the presence of gunshot residue. (11 RT 4899–4903, 4922–23.)

In sum, Petitioner has not shown a due process violation. The California Court of Appeal's rejection of Petitioner's claim was reasonable.

Therefore, Ground One does not merit federal habeas relief.[6]

---

[6] The Court rejects Petitioner's argument in the Traverse that the error in instructing the jury on Count 16 rendered the entire proceedings unfair because the surviving charges "were all intermingled and intertwined with one another." (Traverse 2.) In Count 16, the defendants were alleged to have participated actively in a criminal street gang from December 14, 2006 to May 29, 2007, and on appeal, the parties agreed that the trial court erred in failing to instruct the jury that it was required to agree unanimously on the underlying felonious conduct on which it relied to convict the defendants. (LD 6 at 23–24.) In contrast, Petitioner's convictions on Counts 14 and 15 for conspiracy to commit murder and active participation in a

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### B.   Ground Two

In Ground Two, Petitioner alleges that the prosecution's gang expert, Los Angeles County Sheriff's Sergeant Michael Fujino, relied on inadmissible hearsay evidence to testify regarding information on field identification cards and specific statements made to him by civilian witnesses, police officers, and suspects, in violation of Petitioner's Sixth Amendment right to confront the witnesses against him.  (FAP 5, 45–46.)  Specifically, Petitioner argues that Fujino should not have been able to testify that he received a phone call from the wire room indicating a drive by shooting was about to occur on Bliss Street; that another officer told him that a suspect had admitted "a drive by shooting had occurred on Bliss;" and about another officer's translated statements concerning a witness's account of the shooting.  (*Id.* at 46.)  Respondent contends that the California Court of Appeal reasonably rejected this claim on the grounds that much of the disputed evidence was not testimonial, and in any event, any error was harmless.  (Answer 16–17.) For the following reasons, Ground Two must be denied.

#### 1.   Background

The California Court of Appeal summarized the relevant background:

> Fujino testified that between 2006 and 2007, he investigated Locos Trece as part of the Compton Murder Task Force.  Fujino, who was already familiar with Locos Trece and its members, listened to phone calls that had been recorded by wiretap.  In those recordings, Fujino recognized the voices of Roman, Rodriguez, and [Petitioner], as well as their collaborators and uncharged participants.  Fujino also

criminal street gang were tied specifically to the Baby Shower Incident, and it can be determined that the jurors agreed on the criminal act that formed the basis for the verdicts on those counts.  Likewise, Petitioner's convictions on Counts 5, 6 and 7 were tied specifically to the Lucien Street Incident, and the jurors' agreement on the underlying criminal act can also be determined.

responded to locations where the telephone calls indicated criminal activity was about to occur.

Fujino testified about the general culture and priorities of the gangs; the history, membership, activities, insignias, tattoos, terminology, territory, and relationships of Locos Trece; and the background facts establishing that Locos Trece was a criminal street gang engaging in a pattern of criminal gang activity.  He testified about the defendants and their seven separately-tried collaborators, opining that nine of those indicted were members of Locos Trece and that the tenth individual was a Locos Trece associate.  Based on hypothetical questions mirroring the facts of this case, Fujino testified that the charged offenses were committed for the benefit of, at the direction of, and in furtherance of the gang.

In the course of his testimony, Fujino testified to the contents of 9 different field identification cards and 2 gang cards, five of which he had written.  The statements on the cards were admitted for their truth; in many instances, Fujino essentially read the card into evidence.  For example, with respect to Exhibit 6, the prosecutor asked, "[O]n what date was [Rodriguez] stopped?" and Fujino responded, "It says here October 14, 2005."  "And does the field identification card of People's Exhibit 6 reflect whether or not Jose Rodriguez is a gang member?" the prosecutor asked.  Fujino testified, "It says here that he is suspected of being a gang member . . . ."  The 11 field identification can gang cards were admitted into evidence at the close of the prosecution's case.

(LD 6 at 5–6.)

The California Court of Appeal rejected Petitioner's Confrontation Clause claim:

22

It . . . appears that at least some number of the [field identification] cards did contain case-specific hearsay, not all of which fell within an exception to the hearsay rule or was independently proven through competent evidence.

. . . .

Fujino testified that during 2006 and 2007 he was involved in "this investigation" and was "in charge of investigating any crimes that were generated by" Locos Trece.  He did not testify to the specific circumstances in which every card was prepared.  Fujino testified generally that officers "carded up," or contacted, gang members out on the streets and then filled out a field identification card.  Officers "are responsible" for filling out field identification cards, "and if they meet certain criteria that documents them as a gang member."  Most field identification cards, Fujino testified, were produced after consensual contacts with gang members, but they were also prepared in conjunction with detentions, at traffic stops, and when officers are investigating a crime.  Field identification cards were a way of gathering "gang intelligence."

Gang cards are identification cards that are produced in the investigation of a crime.  They include the time, the person's name, address, personal information, the gang the person belongs to, and the person's moniker, and they are attached to the case file for a specific investigation or arrest.

As the People acknowledge, the record does not include evidence of the circumstances of each card's preparation.  As a result, the record does not permit us to determine whether the hearsay was testimonial in nature, and the People, as the proponent of this

///

23

evidence, did not establish grounds for the admission of this evidence that complied with the confrontation clause.

. . . .

Fujino's percipient witness testimony that he (1) surveilled a particular location based on a telephone call intercepted by the wiretap; and (2) learned from detectives that a suspect had admitted a drive-by shooting had occurred was not hearsay because it was offered not for the truth of the matter asserted but to explain the reasons for Fujino's actions.  Fujino's testimony concerning a witness's prior inconsistent statement was not rendered hearsay because of the use of a translator.

. . . .

We conclude that the admission of any case-specific testimonial hearsay in this matter was harmless beyond a reasonable doubt . . . . Setting aside the presumptive case-specific hearsay evidence, the record contains overwhelming evidence that the defendants were members of the Locos Trece gang.  The entire case revolved around the operation and criminal activities of the gang, and defendants' gang membership was "independently proven by competent evidence."

Fujino had been familiar with the Locos Trece gang since the early 1990s, and he knew the activities of the gang; its clothing, insignia and signs, its territory; and its relationships with other gangs. Fujino properly testified to and relied upon this information in forming his opinions.  Fujino was assigned to the Locos Trece gang; he was personally familiar with and had met all three defendants, and he had listened to thousands of wiretapped telephone calls over the course of the investigation.  The recorded telephone calls offered direct evidence of the defendants' and their collaborators' involvement with Locos

Trece.  Every defendant and collaborator had been recorded in the wiretapped calls played for the jury.  The callers used Locos Trece slang, called each other by their monikers, and revealed the gang's operations, plans, hierarchy, and activities.  They discussed obtaining guns and ammunition; shooting at and being shot at by members of rival gangs, guarding their territory and searching for rival gang members to attack.

> . . . .

[Petitioner] also had admitted to Fujino that he was a member of Locos Trece.  [Petitioner] had tattoos that said "Compton" and referred to Locos Trece.  Fujino had heard [Petitioner] in hundreds or thousands of telephone calls.  He knew that [Petitioner] had contact with Roman and another Locos Trece member based on the investigation and wiretapped calls.  He believed [Petitioner] was an active member of Locos Trece "[b]ased on this entire investigation, basically the information I received from a confidential informant all the way through this investigation, the contacts that were made out in the streets, other gang members that he was associating with at the time by not only myself but also other gang officers and/or deputy sheriffs that patrolled the area, also the actual incident that occurred during this investigation and the phone calls that were intercepted in this investigation."  He also believed [Petitioner] was a "shot caller" in Locos Trece based on factors related to the instant case:  "[b]ased upon all the incidents that occurred in this case, all the telephone conversations that were intercepted and that I monitored, which were approximately over 2,000, that individuals that are defendants in this case were actively seeking permission or guidance from [Petitioner]."

> . . . .

1    Therefore, even without reference to case-specific hearsay, there was

2    overwhelming evidence that the defendants and their collaborators

3    were members of the Locos Trece gang.

4    (*Id.* at 12–22) (footnotes and citations omitted).

5

6                    2.    Legal Standard

7         The Sixth Amendment's Confrontation Clause provides:  "In all criminal

8    prosecutions, the accused shall enjoy the right . . . to be confronted with the

9    witnesses against him."  U.S. Const. amend. VI.  In *Crawford v. Washington*, 541

10   U.S. 36, 53–54 (2004), the Supreme Court held that the Confrontation Clause bars

11   the "admission of testimonial statements of a witness who did not appear at trial

12   unless he was unavailable to testify, and the defendant had had a prior opportunity

13   for cross-examination."

14        Only "testimonial" hearsay statements implicate the Confrontation Clause.

15   *See Michigan v. Bryant*, 562 U.S. 344, 354 (2011); *Whorton v. Bockting*, 549 U.S.

16   406, 420 (2007); *Davis v. Washington*, 547 U.S. 813, 823–24 (2006).  Under one

17   general formulation, a hearsay statement is testimonial when it is "made under

18   circumstances which would lead an objective witness reasonably to believe that the

19   statement would be available for use at a later trial."  *Crawford*, 541 U.S. at 52.

20   Moreover, under the Supreme Court's post-*Crawford* precedents, the "primary

21   purpose" of the statements must be testimonial, in the sense that they were made

22   with the primary purpose of creating an out-of-court substitute for trial testimony or

23   establishing evidence for a subsequent prosecution.  *See Ohio v. Clark*, 576 U.S.

24   237, 244 (2015) (citing, *inter alia*, *Bryant*, 562 U.S. at 358.)

25        The Confrontation Clause has no application to nontestimonial statements.

26   *See Whorton*, 549 U.S. at 420 (recognizing "*Crawford*'s elimination of

27   Confrontation Clause protection against the admission of unreliable out-of-court

28   nontestimonial statements").  A statement is nontestimonial if it is "made out-of-

court with a primary purpose other than prosecutorial use." *See United States v. Solorio*, 669 F.3d 943, 953 (9th Cir. 2012).  If nontestimonial, "the admissibility of a statement is a concern of state and federal rules of evidence, not the Confrontation Clause." *Bryant*, 562 U.S. at 359; *see also United States v. Arnold*, 486 F.3d 177, 192 (6th Cir. 2007) ("[T]he only admissibility question in this setting is whether the statement satisfies the Federal (or State) Rules of Evidence."); *United States v. Berrios*, 676 F.3d 118, 127 (3d Cir. 2012) ("If the statement is nontestimonial, then admissibility is governed *solely* by the rules of evidence.") (emphasis in original).

Further, to merit habeas relief, a petitioner must show the constitutional error's "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation and quotation marks omitted); *see also Merolillo v. Yates*, 663 F.3d 444, 454–58 (9th Cir. 2011) (applying *Brecht* analysis to Confrontation Clause claim).

3.   Discussion

a.  Field Identification Cards

With respect to the information from the field identification cards, the California Court of Appeal focused on admissibility under *People v. Sanchez*, 63 Cal. 4th 665 (2016), a case that was decided after the trial in this matter, holding that "case-specific out-of-court statements" relied on by a prosecution gang expert are inadmissible hearsay under California law and may also violate a defendant's Sixth Amendment right to confrontation.  *Id.* at 686.  To the extent Petitioner's Confrontation Clause claim rests on *Sanchez*, it is not cognizable on federal habeas review because the United States Supreme Court has not held that a gang expert's reliance on hearsay testimony violates a defendant's Confrontation Clause rights under *Crawford*.  *See Hill v. Virga*, 588 F. App'x 723, 724 (9th Cir. 2014) (Mem.) ("The Supreme Court has not clearly established that the admission of out-of-court statements relied on by an expert violate the Confrontation Clause."  (citing

27

*Williams v. Illinois*, 567 U.S. 50, 57–58 (2012) (plurality opinion))).  Further, *Sanchez* does not constitute clearly established federal law under AEDPA.  *See Hernandez v. Small*, 282 F.3d 1132, 1140 (9th Cir. 2002) ("[D]ecisions of [the United States Supreme] Court are the only ones that can form the basis justifying habeas relief . . . ."  (citing *Williams*, 529 U.S. at 381)); *see also Peters v. Arnold*, 765 F. App'x 389, 390 (9th Cir. 2019) (Mem.) (holding that *Sanchez* "does not count as clearly established federal law"), *cert. denied*, 140 S. Ct. 459 (2019).  Absent Supreme Court precedent squarely addressing this issue, the California Court of Appeal's rejection of Petitioner's Confrontation Clause claims cannot be contrary to, or an unreasonable application of, clearly established federal law.  *See Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, . . . it cannot be said that the state court 'unreasonabl[y] applied clearly established Federal law.'"  (citation omitted)); *Stenson v. Lambert*, 504 F.3d 873, 881 (9th Cir. 2007) ("Where the Supreme Court has not addressed an issue in its holding, a state court adjudication of the issue not addressed by the Supreme Court cannot be contrary to, or an unreasonable application of, clearly established federal law.").

Even assuming the field identification cards relied on by Fujino could be considered testimonial under *Crawford*, Petitioner's claim lacks merit.  The California Court of Appeal found that the record does not include enough evidence to determine whether the field identification cards contained testimonial hearsay under state law, but any error in admitting the evidence was "harmless beyond a reasonable doubt."  (LD 6 at 18 (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).  The Court need not reach the issue of whether Petitioner's Confrontation Clause rights were violated by the admission of the field identification cards because the California Court of Appeal's harmless error analysis under *Chapman* was not objectively unreasonable.

///

28

1       The California Court of Appeal reasonably found that any error in the

2   admission of the field identification cards was harmless because the evidence that

3   the defendants were members of a gang was not based primarily on the field

4   identification cards; rather, the record contained "overwhelming evidence that the

5   defendants were members of the Locos Trece gang." (LD 6 at 18.)  The Court

6   agrees.  For example, Fujino testified that Petitioner and some of his cohorts had

7   personally admitted their membership in the Trece gang to him.  (3 RT 2217–18,

8   2246; 4 RT 2730, 2732, 2766, 2769, 2782.)  Fujino authenticated photographs of

9   Petitioner and his codefendants, as well as other cohorts, and he described the

10   tattoos on each of their bodies that reflected their membership in the Locos Trece

11   gang.  (3 RT 2231–32, 2244–45; 4 RT 2733–35, 2749–50, 2754–56, 2762–70.)  In

12   addition, the jury heard evidence from the wiretaps that demonstrated Petitioner's

13   and his collaborators' gang membership and the gang-related nature of the offenses.

14   (12 RT 5722–26, 5728–29, 5440–56, 5458–86.)  Given the strength of the other

15   evidence introduced at trial, the admission of the field identification cards did not

16   have a substantial or injurious effect on the jury's verdict, and the state court

17   reasonably concluded that any error in admitting the field identification cards was

18   harmless.[7]  *See Brecht*, 507 U.S. at 637; *see also, e.g., Knoller v. Miller*, No. 12-cv-

19   0996-JST, 2014 U.S. Dist. LEXIS 91146, at \*87–98 (N.D. Cal. July 3, 2014)

20   (applying *Brecht* analysis to Confrontation Clause claim and concluding that trial

21   court's admission of letters documenting petitioner's Aryan Brotherhood affiliation

22   was harmless "[i]n light of the strong case against [p]etitioner, and that much of the

---

23

24   [7] Although the Court must determine whether the California Court of Appeal
     applied *Chapman* in an "objectively unreasonable manner," *see Davis v. Ayala*, 576
25   U.S. 257, 268–69 (2015), the Court need not conduct a "separate
     AEDPA/*Chapman* determination" since a finding that the error caused actual
26   prejudice under the "more stringent" *Brecht* test would "necessarily mean[] that the
     state court's harmlessness determination was not merely incorrect, but objectively
27   unreasonable." *Mays v. Clark*, 807 F.3d 968, 980 (9th Cir. 2015); *see also Hall v.
     Haws*, 861 F.3d 977, 992 (9th Cir. 2017).

1  information was corroborated by other evidence in the record"), *aff'd*, 633 F. App'x

2  418 (9th Cir. 2016) (Mem.).

3

4                  b.  Statements made to Fujino

5          With respect to Petitioner's contention that Fujino's testimony about specific

6  statements made to him by civilian witnesses, police officers, and suspects violated

7  his Confrontation Clause rights, the California Court of Appeal reasonably rejected

8  this claim, finding the testimony nonhearsay.  (LD 6 at 17.)  Fujino's testimony that

9  he received a phone call from the wire room indicating that a drive-by shooting was

10  about to occur on Bliss Street, and that officers detaining Rodriguez, Saul,

11  Montelongo, and Marquez indicated that a suspect had admitted a drive-by shooting

12  had occurred on Bliss Street was specifically not admitted for its truth, but to

13  explain Fujino's actions.  (10 RT 4599, 4608–09) (overruling Petitioner's hearsay

14  objections).  Because this was nonhearsay evidence, such statements cannot lead to

15  a Confrontation Clause violation.  *Crawford*, 541 U.S. at 59 n.9 (the Confrontation

16  Clause "does not bar the use of testimonial statements for purposes other than

17  establishing the truth of the matter asserted").  Regarding Fujino's testimony about

18  prior inconsistent statements made by Vargas to Fujino, assisted by a translator (10

19  RT 4618), the Supreme Court has not held that the use of a translator violates the

20  Confrontation Clause.  *See United States v. Aifang Ye*, 792 F.3d 1164, 1168–69 (9th

21  Cir. 2015) (reaffirming pre-*Crawford* circuit precedent holding that the use of a

22  translator does not violate the Confrontation Clause "as long as a translator acts

23  only as a language conduit").

24          Therefore, Ground Two does not merit federal habeas relief.

25

26  **C.    Ground Three**

27          In Ground Three, Petitioner claims that appellate counsel provided

28  ineffective assistance by failing to exhaust the claim in a petition for review to the

California Supreme Court that the trial court erred when it failed to sua sponte give an unanimity instruction as set forth in CALCRIM No. 3500.  (FAP 6, 15.)  Respondent contends that this claim was reasonably rejected by the California Supreme Court because the California Court of Appeal reversed Petitioner's conviction on direct appeal due to the instructional error; thus, there was no basis for appellate counsel to continue to exhaust the claim.  (Answer 25–26.)  For the following reasons, Ground Three must be denied.

### 1.   Background

On direct review, Petitioner appealed his conviction on Count 16, active participation in a criminal street gang between December 2006 and May 2007, on the ground that the trial court did not instruct the jury that it was required to agree unanimously on the underlying felonious conduct on which it relied to convict him.[8]  (LD 3 at 31–37.)  The Attorney General agreed that the trial court erred and requested that the California Court of Appeal reverse the convictions on Count 16 because the error could not be determined to be harmless.  (LD 6 at 24.)  The California Court of Appeal agreed because "it c[ould]not be determined whether each juror agreed on the particular criminal act that formed the basis for the verdict, or whether the jury based its verdicts on count 16 on the same conduct that it used to convict them of the same offense in counts 3, 7, 13, 15, or 19."  (*Id.* at 25.)  The appellate court, therefore, reversed the convictions on Count 16, but noted that since the trial court stayed the sentence on Count 16 for each defendant, the reversal of the convictions on Count 16 did not alter the defendants' sentences.  (*Id.* at 25–26.)

Petitioner did not raise the claim in the petition for review.  (LD 7.)

---

[8] Roman and Rodriguez also appealed their convictions on Count 16 on the same ground.  (LD 6 at 24.)

31

1          2.     Legal Standard

2          "The Sixth Amendment guarantees criminal defendants the effective

3    assistance of counsel."  *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (per curiam);

4    *see also Missouri v. Frye*, 566 U.S. 134, 138 (2012) ("The right to counsel is the

5    right to effective assistance of counsel.").  To succeed on an ineffective assistance

6    of counsel claim, a federal habeas petitioner must demonstrate:  (1) counsel's

7    performance was deficient, and (2) the deficient performance prejudiced the

8    defense.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  An ineffective

9    assistance claim may be denied if the petitioner fails to establish either prong of the

10   *Strickland* test.  *See id*.; *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002) ("Failure

11   to satisfy either prong of the *Strickland* test obviates the need to consider the

12   other.").

13         The *Strickland* standard also applies to claims of ineffective assistance of

14   appellate counsel.  *See Smith v. Robbins*, 528 U.S. 259, 285 (2000).  That is, a

15   habeas petitioner must show that (1) appellate counsel's failure to discover and

16   raise an issue fell below an objective standard of reasonableness, and (2) there is a

17   reasonable probability that, but for appellate counsel's failure to raise the issue, the

18   petitioner would have prevailed on appeal.  *See Moormann v. Ryan*, 628 F.3d 1102,

19   1106 (9th Cir. 2010).  Neither requirement is satisfied if appellate counsel fails or

20   declines to raise a meritless claim on appeal.  *Id*. at 1109–10 (collecting Ninth

21   Circuit cases).

22

23         3.     Discussion

24         Petitioner argues that his appellate counsel was ineffective for failing to raise

25   the instructional error claim in his petition for review to the California Supreme

26   Court on direct appeal.  (FAP 6, 15.)  As noted above, Petitioner raised this

27   ineffective assistance claim in a habeas petition to the California Supreme Court,

28   which was denied without comment or citation of authority.  (*See* LD 9; LD 10.)

1
2
3
4
5
6
7
8
9
10

     After an independent review, the Court cannot conclude that the California Supreme Court's decision to deny this claim was contrary to, or an unreasonable application of, clearly established federal law.  *See Murray*, 745 F.3d at 996–97.  Raising an instructional error claim in the petition for review would have been meritless because relief had already been granted.  Accordingly, Petitioner fails to meet either prong of the *Strickland* inquiry, and this claim must be denied.  *See, e.g., Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985) ("Failure to raise a meritless argument does not constitute ineffective assistance."); *Jones v. Ryan*, 691 F.3d 1093, 1101 (9th Cir. 2012) ("It should be obvious that the failure of an attorney to raise a meritless claim is not prejudicial . . . .").

11

     Therefore, Ground Three does not merit federal habeas relief.

12
13

## VII.   REQUEST FOR EVIDENTIARY HEARING

14
15
16

     In the Traverse, Petitioner requests an evidentiary hearing "to determine the extent of the effect of the [r]eversals, [d]ismissals, [r]ecantations, and perjured testimony on the [e]ntirety [o]f [t]he [p]roceedings."  (Traverse 3.)

17
18
19
20
21
22
23
24
25
26
27

     For claims subject to the AEDPA standard of review, this Court "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  "[W]hen the state-court record precludes habeas relief under the limitations of § 2254(d), a district court is not required to hold an evidentiary hearing."  *Id*. at 183 (citation and quotation marks omitted).  Further, an evidentiary hearing is not warranted where "the record refutes the applicant's factual allegations or otherwise precludes habeas relief."  *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).  "It is axiomatic that when issues can be resolved by reference to the state court record, an evidentiary hearing becomes nothing more than a futile exercise."  *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998).

28
///

1    As discussed, Petitioner's claims are precluded by Section 2254(d) or
2  resolvable solely by reference to the state-court record.  Therefore, his request for
3  an evidentiary hearing is denied.
4
5  **VIII.  CONCLUSION**
6    IT THEREFORE IS ORDERED that the FAP is denied and that judgment
7  shall be entered dismissing this action with prejudice.
8
9  DATED:  October 26, 2020
10
11
12                              MARIA A. AUDERO
                              UNITED STATES MAGISTRATE JUDGE
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28